UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| NORTHEAST EMERGENCY APPARATUS LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| MINE RESPIRATOR COMPANY LLC, et al., | ) ) ) |
| Defendants. | |

2:25-cv-00556-SDN

# ORDER

This case concerns a contractual dispute between Plaintiff Northeast Emergency Apparatus LLC ("NEA") and Defendants Mine Respirator Company LLC d/b/a Mine Safety Appliances Company ("MSAC") and MSA Safety Sales LLC ("MSA Safety") (collectively, "Defendants"). NEA alleges MSA Safety[1] wrongfully terminated NEA's distributorship agreement in violation of Maine laws. At issue here is NEA's first motion for a temporary restraining order ("TRO"),[2] ECF No. 4, which seeks to enjoin MSA Safety from terminating or otherwise altering its distributorship agreement with NEA. For the

---

[1] While NEA originally entered a business relationship with MSAC, the latter assigned the distributorship agreement to MSA Safety effective January 1, 2019. ECF No. 20 at 2 n.2. Accordingly, to Defendants, MSAC is not currently "an affiliate of MSA Safety and does not manufacture, distribute, or have any other involvement with the distribution of MSA Safety products at issue in this dispute." ECF Nos. 22 at 1 n.2, 22-1 at 23.

[2] NEA's motion requests both a temporary restraining order and a preliminary injunction. ECF No. 4. In this Order, the Court addresses only NEA's motion for a temporary restraining order, not its motion for a preliminary injunction. An evidentiary hearing on the motion for a preliminary injunction is scheduled for Monday, December 15, 2025, at 10:00 a.m.

1

following reasons, NEA's first motion for a TRO, ECF No. 4, is GRANTED IN PART and DENIED IN PART.[3]

## I. Factual and Procedural Background[4]

MSA Safety manufactures "respiratory and other personal protective equipment and safety devices for fire and rescue services, industrial workers, police, military and civil defense organizations." ECF No. 29-4 at 2. To sell its products, MSA Safety utilizes authorized distributors. *Id*. at 3. NEA is one such authorized distributor and has been since 2008. *Id*. NEA distributes and services safety equipment from MSA Safety and other providers for fire departments and other emergency personnel. *Id*. A distributorship agreement governs the business relationship between NEA and MSA Safety; before the purported termination, the parties were operating under an agreement executed in 2018 (the "Fire Service Agreement" or "Agreement"). ECF No. 29-4 at 4, 22–34. Pertinent here, the Agreement contains provisions concerning obligations of the distributor,[5]

---

[3] On December 3, 2025, counsel for NEA submitted a second emergency motion for temporary injunctive relief, ECF No. 35, requesting that "[p]ending the Court's order on the Amended Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction . . . MSA Safety Sales, LLC is ordered to accept and process NEA orders and treat NEA in the same manner as all other MSA distributors on the same business and credit terms as existed before July 1, 2025." *Id*. at 5–6 (emphasis added). For the same reasons provided herein, that request is DENIED as MOOT.

[4] The facts are derived from NEA's amended verified complaint, *see* ECF No. 29-4, and exhibits thereto, as well as the parties' filings, exhibits, affidavits, and briefing related to NEA's request for injunctive relief.

[5] *See* ECF No. 29-4 at 23–26 (requiring, among other things, the distributor to undertake "best efforts to promote" MSA Safety's products, "fully service MSA [Safety] and its Products," and "carry a representative stock of the Products").

termination and nonrenewal of contracts,[6] the availability of damages,[7] arbitration,[8] and choice-of-law.[9]

On a July 22, 2025, phone call, MSA Safety notified NEA that MSA Safety was terminating the Fire Service Agreement. ECF No. 29-4 at 10. The following day, an individual affiliated with MSA Safety emailed NEA, attaching to the correspondence a letter informing NEA that termination would take effect thirty days from the date of the letter's delivery. *Id*. at 11; ECF Nos. 22 at 3, 22-1 at 26–30. The letter also informed NEA that MSA Safety would "accept the return" of products that met the requirements as provided in MSA Safety's "Return Material Policy." ECF No. 22-1 at 29. On August 26, 2025, NEA notified MSA Safety via an attorney that the latter's purported termination of the Fire Service Agreement violated Maine laws. ECF Nos. 29-4 at 42–43, 22-4 at 3–4.

---

[6] "This Agreement shall be effective as of the day and year first above written and shall continue until terminated by either party hereto at any time upon at least 30 days' prior written notice to the other, except as otherwise provided in this Agreement. Termination of this Agreement shall not affect MSA [Safety]'s obligation to fill orders which are received while this Agreement is in effect, except that MSA [Safety] may, subject to its own discretion, require COD payment for goods shipped or impose such other special credit terms as it deems appropriate. Upon termination of this Agreement by MSA [Safety], MSA [Safety] will accept the return from Distributor, transportation charges prepaid, of all Products held in stock by Distributor pursuant to paragraph 2(c) hereof (except for obsolete or discontinued Products, regardless of their condition) and shall reimburse Distributor for all amounts paid by Distributor to MSA [Safety] therefore, provided such returned Products are undamaged and still in salable condition." ECF No. 29-4 at 29.

[7] "Except as specifically provided otherwise herein, neither party shall be liable to the other for any claims for incidental, special or consequential damages resulting from any breach of this Agreement." ECF No. 29-4 at 32.

[8] "Any controversy, claim or dispute arising under this Agreement shall be finally settled by arbitration in accordance with the rules then in effect of the American Arbitration Association in Pittsburgh, Pennsylvania by three arbitrators appointed according to those rules. Any award of the arbitrators shall be final and conclusive on the parties to this Agreement, judgment upon such award may be entered in any court having jurisdiction thereof, and no appeal shall lie therefrom. Each party hereto hereby gives consent to the personal jurisdiction of any such court in reference to any matter arising out of the foregoing arbitration or the enforcement thereof." ECF No. 29-4 at 31.

[9] "This Agreement shall be deemed to be a contract made under the laws of the Commonwealth of Pennsylvania and shall for all purposes be construed and enforced in accordance with the laws of the said Commonwealth." ECF No. 29-4 at 32.

3

MSA Safety replied by way of counsel on October 3, 2025, disputing NEA's claims. ECF Nos. 29-4 at 44–46, 22-4 at 11–13.

On October 24, 2025, NEA sued MSAC in Maine state court for alleged violations of the Maine Franchise Laws for Power Equipment, Machinery and Appliances, 10 M.R.S. §§ 1361–1370 (2025) (the "Franchise Laws"), and the Maine Unfair Trade Practices Act, 5 M.R.S. §§ 205-A to 214 (2025) ("MUTPA"). *See* ECF No. 29-1 at 15–17. Additionally, NEA sought a declaratory judgment, *id*. at 17, and injunctive relief, ECF No. 29-2. Five days later, NEA amended its filings to add MSA Safety as a defendant. *See* ECF Nos. 29-4 at 1–2, 29-5 at 1.

On November 7, 2025, MSA Safety removed the case to federal court based on diversity jurisdiction. ECF No. 1. That same day, NEA filed the present amended motion for a temporary restraining order and/or preliminary injunction ("TRO Motion"), ECF No. 4, and an emergency motion to expedite the TRO Motion, ECF No. 3.[10] On November 11, 2025, MSA Safety filed a motion to compel the parties to arbitrate ("Arbitration Motion"). ECF No. 9. The following day, I held a conference with counsel. ECF No. 12. During the conference, I ordered simultaneous briefing on whether I had the authority to hear the TRO Motion while the Arbitration Motion was pending. *Id*. The parties submitted their briefs on the TRO-Arbitration question on November 17, 2025, ECF Nos. 20, 21, and filed their respective replies two days later, ECF Nos. 24, 25. Also during that time, MSA Safety responded in opposition to the TRO Motion, ECF No. 22, and NEA

---

[10] On November 17, 2025, NEA requested leave to file a second amended complaint; the motion remains pending. *See* ECF No. 18. NEA maintains that their "proposed amendment" does not affect the Court's injunctive relief analysis because the TRO Motion, ECF No. 4, "relies exclusively on the Maine Franchise Laws," ECF No. 18 at 4.

4

replied in support of their requested injunctive relief, ECF No. 26. And on December 2, 2025, MSA Safety responded in opposition to the Arbitration Motion. ECF No. 34.

## II.  Arguments

### A. Northeast Emergency Apparatus LLC

NEA argues the Franchise Laws apply to the Fire Service Agreement for three main reasons. First, the MSA Safety products NEA sells are "goods" within the meaning of the statute. ECF No. 4 at 10–13. Second, NEA and MSA Safety are a "community of interest" within the meaning of the statute. *Id.* at 13–14. And third, MSA Safety's purported termination of the Fire Service Agreement violates the Franchise Laws because it does not provide good cause, nor does it provide proper notice. *Id.* at 14–15.

Next, NEA claims they are entitled to injunctive relief without a "showing of irreparable harm in the normal equity sense" because the Franchise Laws only require demonstrating a statutory breach. *Id.* at 16 (quoting *UV Indus., Inc. v. Posner*, 466 F. Supp. 1251, 1255 (D. Me. 1979)). Even so, NEA maintains irreparable harm will occur in the form of losing "good will, customer contacts, and referral sources," all of which cannot be reasonably or adequately translated into monetary damages. *Id.* at 16–18 (quoting *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 192 (D. Me. 2005)). NEA further contends the balance of harm weighs in their favor because the requested injunctive relief simply requires continuity of a business agreement that has existed "over the past 17 years,"[11] whereas termination would cause NEA to "lose its vital business, customers, and employees." *Id.* at 19. Finally, NEA frames public interest as being on their side because

---

[11] NEA seeks to enjoin MSA Safety from terminating or not renewing the Fire Service Agreement, "[a]mending, modifying and/or changing the usual business and credit terms and practices that have existed between Plaintiff and MSA before July 1, 2025," and "[i]nterfering with Plaintiff's customers and/or business relationships." ECF No. 4-1 at 1.

they seek to preserve the status quo and "[t]here is no adverse public interest in granting the injunction," but "there is concern about the safety of firefighters and the public as a result of the defendants' actions." ECF No. 26 at 7 (quoting *Fire Tech v. Scott Techs., Inc.*, No. CV-09-159, 2009 WL 8582937 (Me. Super. June 17, 2009) (trial order)).

### B. MSA Safety Sales LLC

MSA Safety argues the Franchise Laws do not apply to the Fire Service Agreement for two main reasons. First, the Franchise Laws "do[] not encompass [their] battery-operated products, because batteries are not 'goods' within the meaning of the statute." ECF No. 22 at 7. Second, "[a] claim under the Franchise Law[s] requires a 'community of interest in the marketing of goods and related services'" and that community does not exist here. *See id.* at 10–11 (quoting 10 M.R.S. § 1361(3)).

Next, MSA Safety claims NEA is not entitled to injunctive relief because they have not made the requisite showing of irreparable harm such that "money damages" cannot provide "an adequate remedy." *Id.* at 12. MSA Safety further contends the balance of harm weighs against NEA because the requested relief does more than simply require MSA Safety "to continue business . . . under the same circumstances that it has done such business over the years" but also seeks judicially imposed "lenient credit terms . . . without any recourse to collect past or future non-payments." *Id.* at 13 (internal quotation marks omitted). Finally, MSA frames public interest as being on its side because, in its view, NEA is not simply requesting a stay of the status quo; rather, NEA is seeking to disrupt the status quo by imposing affirmative obligations onto MSA Safety in the form of barring MSA Safety from terminating the Agreement "despite [NEA's] history of non-payment" and forcing MSA Safety "to extend lenient credit terms to [NEA], as if it had always paid on time, without any recourse to collect past or future non-payments." *Id.* at

6

6–7, 13. Furthermore, MSA Safety categorizes NEA's "willful disregard of the parties' agreement to arbitrate" as a threat to the public interest. *Id*. at 13.

### III.   Discussion

### A.  Legal Standard

"[A] district court can grant injunctive relief . . . pending arbitration, provided the prerequisites for injunctive relief are satisfied." *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 51 (1st Cir. 1986). Injunctive relief pending arbitration "protect[s] the status quo in order to ensure that the arbitration serves a productive purpose." *Baychar, Inc. v. Frisby Techs.*, No. 01-CV-28, 2001 WL 856626, at *9 (D. Me. July 26, 2001). Because injunctive relief is an "extraordinary and drastic remedy," *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8 (1st Cir. 2012), such "interim relief under *Teradyne* assumes a showing of some short-term emergency that demands attention while the arbitration machinery is being set in motion," *Next Step Med. Co., Inc. v. Johnson & Johnson Int'l*, 619 F.3d 67, 70 (1st Cir. 2010); *see also Cunningham v. Lyft, Inc.*, 17 F.4th 244, 254 (1st Cir. 2021) (noting a "preliminary injunction pending arbitration is ordinarily temporary emergency relief that extends only until the arbitrator itself can decide whether to award relief." (quoting *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 40 n.4 (1st Cir. 2010)).

When evaluating whether to grant a temporary restraining order pending arbitration, the Court applies the same four-factor analysis it utilizes for a preliminary injunction. *Monga v. Nat'l Endowment for Arts,* 323 F. Supp. 3d 75, 82 (D. Me. 2018); *Braintree Lab'ys*, 622 F.3d at 40–41. The burden is on the movant to establish the: (1) likelihood of success on the merits; (2) prospect of irreparable harm; (3) balance of relevant equities weighs in their favor; and (4) injunctive relief is in the public interest.

7

*Peoples Fed. Sav. Bank*, 672 F.3d at 9. "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (citing *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)).

### B. Likelihood of Success on the Merits

Here, NEA's request for injunctive relief is based on protections found in the Franchise Laws, 10 M.R.S. §§ 1361–1370, and MUTPA, 5 M.R.S. §§ 205-A to 214. I examine each in turn based on the limited record before me.

*1. Maine Franchise Laws for Power Equipment, Machinery and Appliances*

NEA first alleges claims under the Franchise Laws, ECF No. 29-4, which governs "unfair methods of competition and unfair and deceptive practices," 10 M.R.S. § 1363. The statute prohibits conduct "that is arbitrary, in bad faith or unconscionable and that causes damage to another manufacturer, distributor or dealer or to the public." 10 M.R.S. § 1363(1). To further this goal, the Franchise Laws permit courts to grant injunctions. *Id*. § 1362 ("A dealer, distributor or franchisee who has been damaged by violation of this chapter may bring an action to enjoin the violation . . . .").

Relevant to this dispute is a provision of the Franchise Laws that prohibits manufacturers from terminating or failing to renew a franchise relationship without proper notice,[12] good faith, good cause, and an opportunity to cure defective performance.

---

[12] Proper notice for termination or nonrenewal is outlined in 10 M.R.S. § 1366, which requires notification to "[b]e sent by registered, certified or other receipted mail . . . or personally delivered to the distributor or dealer," as well as "[c]ontain a statement of intent to terminate or not renew the franchise together with the reasons for termination or nonrenewal and the effective date of the termination, nonrenewal or expiration." 10. M.R.S. §§ 1366(1)–(2).

8

*Id.* § 1363(3). Also pertinent is the Franchise Laws' "public policy" section, which declares void and unenforceable "[a] contract or part of a contract or activity undertaken pursuant to a contract" that violates any provision in the Franchise Laws. *Id.* § 1368. Furthermore, protections under the Franchise Laws cannot be contractually waived. *Id.*

On the abbreviated record available at this early stage, MSA Safety's notices of termination do not appear to comport with the Franchise Laws' statutory requirements as they did not set forth good cause nor provide NEA with an opportunity to cure. ECF No. 26 at 4. Therefore, in examining the likelihood of success on the merits, my analysis focuses on whether the Franchise Laws apply, with the parties' seemingly grounding their disagreement in the statutory definitions of "goods" and "community of interest." The Franchise Laws define "[g]oods" as "commercial or business equipment, machinery or appliances that use electricity, gas, wood, a petroleum product or a derivative of a petroleum product for operation." *Id.* § 1361(8). And while the Franchise Laws do not define "community of interest," the statute requires "a community of interest in the marketing of goods and related services at wholesale, retail, by leasing or otherwise." *Id.* § 1361(3).

As to the definition of "goods," a Maine Superior Court case, *Fire Tech*, 2009 WL 8582937, provides useful guidance.[13] In *Fire Tech*, the Maine state court decided a similar case that evaluated the merits of a TRO pending arbitration concerning the termination of a distribution agreement for a self-contained breathing apparatus ("SCBA") in alleged violation of the Franchise Laws. 2009 WL 8582937. There, the Maine state court determined SCBA is considered "goods" under the Franchise Laws because the SCBA's

---

[13] When sitting in diversity, federal courts apply the substantive law of the forum state. *Priv. Cap. Fund LLC v. Begg*, No. 2:21-CV-00090, 2021 WL 3422371, at *3 (D. Me. Aug. 5, 2021).

9

battery-powered electrical system fits within the statutory definition of "operation." *Id*. At this juncture, I see no reason to differ from the well-reasoned opinion that SCBA, and by extension the similar breathing apparatus MSA Safety manufactures and NEA distributes, meets the definition of goods under the Franchise Laws.

Next, "community of interest" can be established based on the distributor's financial investment in the franchise, the duration of the manufacturer-distributor relationship, and the type of demands the manufacturer places on the distributor. *See Fitzpatrick v. Teleflex, Inc.*, 763 F. Supp. 2d 224, 234 (D. Me. 2011) (noting the Franchise Laws do not define the term "community of interest," asserting there is no "Maine decisional law construing what the Maine Legislature meant by the . . . concept," and using "persuasive precedent" to provide factors for analyzing the term); *Boyle v. Vanguard Car Rental USA, Inc.*, No. CIV. 08-6276, 2009 WL 3208310, at *7 (D.N.J. Sept. 30, 2009) (analyzing a New Jersey franchise law that utilizes similar statutory language to Maine's and stating "[d]evelopment of customer goodwill can be a franchise-specific investment sufficient to find a community of interest" and "[s]uch investment includes investment of time and effort and does not require monetary investment, so long as the intangible skills, knowledge, or goodwill gained are franchise-specific"). On the record before me here, NEA has invested ample time and money in MSA Safety inventory, marketing materials, outreach events, and related employee training. *See* ECF No. 4 at 3–7. Further, NEA expended time and money "to build the MSA [Safety] brand and goodwill in Maine" by working to "resolve legacy issues with MSA [Safety] products," such as equipment retrofits. ECF No. 29-4 at 3–4. Thus, at this preliminary point, the extent of NEA's investment in MSA Safety is sufficient to show a community of interest.

Accordingly, on the truncated record before me, NEA offers the stronger argument, demonstrating a likelihood of success on the merits.

### 2. *NEA's Requested Mandatory, Affirmative Relief*

However, this likelihood of success extends only to the prohibitory portions[14] of NEA's requested injunction, as the movant's burden is greater when it seeks mandatory, affirmative action. *See L.L. Bean, Inc. v. Bank of Am.*, 630 F. Supp. 2d 83, 89 (D. Me. 2009) (discussing the stringent standard for analyzing mandatory injunctive relief and noting "this Court should only sparingly exercise its authority to issue an interlocutory injunction which requires a defendant to take affirmative action" (quotation modified)). Here, NEA's request to enjoin MSA Safety from "[a]mending, modifying and/or changing the usual business and credit terms and practices that have existed between Plaintiff and MSA before July 1, 2025," ECF No. 4-1 at 1, fits more closely within the mandatory relief framework because the practical effect on MSA Safety is to require the company to "impose a line of credit for [NEA] to use, interest free," ECF No. 24 at 4, which goes further than simply preserving the status quo, *see Bond v. Dunlap*, No. 20-CV-00216, 2020 WL 4275035, at *7 (D. Me. July 24, 2020) ("A mandatory injunction, which requires affirmative action by the non-moving party [and] alters rather than preserves the status quo, normally should be granted only in those circumstances when the exigencies of the situation demand such relief." (quotation modified)). As such, I do not find a likelihood of success as to NEA's requested mandatory, affirmative relief.

---

[14] That is the requests for injunctive relief to prevent MSA Safety from "[t]erminating, canceling, failing to renew, or refusing to continue its distributorship" or "[i]nterfering with Plaintiff's customers and/or business relationships." ECF No. 4-1 at 1.

11

### 3. Maine Unfair Trade Practices Act

NEA also alleges a claim under the MUTPA,[15] ECF No. 29-4 at 17, which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," 5 M.R.S. § 207. NEA's argument under MUTPA is unavailing, however, because the statute's "private remedies" section does not extend to commercial entities. *See* 5 M.R.S. § 213(1) (providing a private right of action for "[a]ny person who purchases or leases goods, services or property, real or personal, *primarily for personal, family or household purposes*") (emphasis added); *Oliver Stores v. JCB, Inc.*, No. 11-CV-353, 2012 WL 4755378, at *3 (D. Me. Oct. 5, 2012) (discussing the relationship between the Franchise Laws and MUTPA and concluding that MUTPA provides "no private right of action" for commercial entities); *Summit Auto Sales, Inc. v. Draco, Inc.*, No. 15-cv-00736, 2017 WL 3896691, at *14 (N.D. Ala. Sept. 6, 2017) (declining to find a private right of action under MUTPA because the plaintiff "unquestionably purchased the [product] at issue [in the case] for commercial purposes"). Therefore, because NEA is a commercial entity whose purchases of MSA Safety's products were commercial in nature, NEA lacks a private right of action under MUTPA. Thus, NEA cannot prevail pursuant to MUTPA, and the remaining three factors need not be analyzed for this claim.

### C. Irreparable Harm

Despite NEA's contention that the Franchise Laws permit injunctive relief absent a showing of irreparable harm, the "statutory language merely authorizes the dealer to

---

[15] MSA Safety does not address the substance of NEA's MUTPA claim because it is "premised on" a purported violation of the Franchise Laws. ECF No. 22 at 6 n.3. To this point, "[i]n 1993, Maine's Legislature made significant changes to the [Franchise Laws], including the enactment of a 'Penalty' provision which states simply: 'Violation of this chapter constitutes an unfair trade practice under [MUTPA].'" *Oliver Stores v. JCB, Inc.*, No. 11-CV-353, 2012 WL 4755378, at *2 (D. Me. Oct. 5, 2012) (quoting 10 M.R.S. § 1370) (discussing the relationship between the Franchise Laws and MUTPA).

12

bring injunctive action, it does not create a new set of standards to evaluate a motion for a TRO." *Frank Martin Sons, Inc. v. John Deere Const. & Forestry Co.*, 542 F. Supp. 2d 101, 103 (D. Me. 2008). Therefore, to be successful on their TRO Motion at this stage, NEA must demonstrate irreparable harm, which "means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). Here, "[t]he potential losses to [NEA's] consumer base, business reputation and goodwill, and the loss of skilled and trained employees are sufficient to demonstrate irreparable harm." *Fire Tech*, 2009 WL 8582937; *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) ("By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable."); *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) ("District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." (quoting *Wagner v. Taylor*, 836 F.2d 566, 575–76 (D.C. Cir. 1987)). Thus, at this stage, NEA has sufficiently established irreparable harm.

### D. Balance of Equities

The balance of equities examines the requested injunctive relief's potential harm on both parties. On one hand, as discussed above, there is the potential for irreparable harm to NEA's business. On the other hand, MSA Safety no longer wants to be in a business relationship with NEA and explains how the requested relief could potentially harm MSA Safety's bottom line. But the restraining order, at least in part, only requires MSA Safety to abide by the terms of the Agreement that has existed in some form for the past seventeen years and in its current iteration since 2018. *See Heck Implement, Inc. v.*

*Deere & Co.*, 926 F. Supp. 138, 140 (W.D. Mo. 1996) (enjoining supplier from terminating dealership agreement and asserting "[i]n [the court's] judgment, likely harm to [the plaintiff] from loss of the dealership greatly outweighs any likely harm to [the defendant] from continuing the dealership for a hypothetical six months"). As such, the balance of equities tips toward granting the temporary restraining order.

### E. Public Interest

MSA Safety posits NEA's willful disregard for their agreement to arbitrate and abuse of injunctive relief threaten the public interest, but the public's interest is best served by preserving the Agreement pending determination, by either an arbitrator or this Court, that MSA Safety's termination did not run afoul of the Franchise Laws. *See Nimbus Therapeutics, LLC v. Celgene Corp.*, 570 F. Supp. 3d 100, 127 (S.D.N.Y. 2021) (analyzing a motion for preliminary injunction and stating "'[t]here is a well-recognized public interest in enforcing contracts and upholding the rule of law'" (quoting *Empower Energies, Inc. v. SolarBlue, LLC*, No. 16-CV-3220, 2016 WL 5338555, at *13 (S.D.N.Y. Sept. 23, 2016)) (alterations in *Nimbus*)). Accordingly, public interest weighs in favor of granting a temporary restraining order.

### IV. Conclusion

For these reasons, NEA's first motion for a temporary restraining order, ECF No. 4, is **GRANTED** as to the Defendants' "[t]erminating, canceling, failing to renew, or refusing to continue its distributorship" and "[i]nterfering with Plaintiff's customers and/or business relationships," and it is **DENIED** as to the Defendants' "[a]mending, modifying and/or changing the usual business and credit terms and practices that have existed between [NEA] and MSA before July 1, 2025." Additionally, NEA's second motion for a temporary restraining order, ECF No. 35, is **DENIED** as **MOOT**.

The hearing on the motion for a preliminary injunction will take place on Monday, December 15, 2025, at 10:00 a.m.

**SO ORDERED.**

Dated this 4th day of December, 2025.

<u>/s/ Stacey D. Neumann</u>
**UNITED STATES DISTRICT JUDGE**
