UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| NORTHEAST EMERGENCY APPARATUS LLC, | ) ) ) | |
| Plaintiff, | ) ) | 2:25-cv-00556-SDN |
| v. | ) ) | |
| MINE RESPIRATOR COMPANY LLC, et al., | ) ) ) | |
| Defendants. | | |

## ORDER

A distributor of fire services equipment sued the manufacturer of those products for purportedly terminating its business contract in violation of Maine state laws. The parties disagree as to whether the dispute should be sent to arbitration. Presently before me in this case are two motions: (1) Plaintiff's Motion for Leave to File Second Amended Verified Complaint ("Motion to Amend"), ECF No. 18; and (2) Defendant's Motion to Compel Arbitration and Stay Proceedings ("Arbitration Motion"), ECF No. 9. For the reasons outlined below, I **GRANT** Plaintiff's Motion to Amend and, because I find arbitration appropriate, **TRANSFER** Defendant's Arbitration Motion to the United States District Court for the Western District of Pennsylvania.

# I.    Factual Background and Procedural History[1]

I have set forth the factual background and procedural history in my Order granting injunctive relief. *See* ECF No. 36 at 2–5. Nonetheless, some facts relevant to this Order are noted here.

Defendant MSA Safety Sales LLC ("MSA Safety")[2] manufactures safety equipment for fire and rescue services. ECF No. 29-4 at 2. Since 2008, Plaintiff Northeast Emergency Apparatus LLC ("NEA") has been an authorized distributor of MSA Safety's products. *Id.* at 3. A distributorship agreement governs the business relationship between NEA and MSA Safety; before the purported termination, the parties were operating under an agreement executed in 2018 (the "Fire Service Agreement" or "Agreement"). *Id.* at 5,

---

[1] Courts usually resolve motions to compel arbitration under the summary judgment standard. *Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 175 (1st Cir. 2021). Because MSA Safety made its Arbitration Motion "in connection with a motion to . . . stay, [I] draw the relevant facts from the operative complaint and the documents submitted . . . in support of the motion to compel arbitration." *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 55 (1st Cir. 2018); *see* ECF Nos. 1, 18, 29-4. The facts discussed herein are undisputed.

[2] The business dispute at issue here involves two defendants—MSA Safety and Mine Respirator Company LLC d/b/a Mine Safety Appliances Company ("MSAC")—and the January 2019 assignment of the Fire Service Agreement from MSAC to MSA Safety. *See* ECF Nos. 9 at 2, 34 at 2 n.1. Although NEA initially challenged the propriety of the assignment, ECF No. 34 at 2, 2 n.1, it later conceded the assignment was properly established, ECF No. 54. In light of NEA's concession, I address NEA's claims only as to MSA Safety, which NEA amended its filings to add as a Defendant. *See* ECF Nos. 29-4 at 1–2, 29-5 at 1.

22–33. Pertinent here, the Fire Service Agreement contains provisions concerning arbitration,[3] choice-of-law,[4] and termination and nonrenewal of contracts.[5] *Id.* at 22–33.

On July 22, 2025, MSA Safety notified NEA it would be terminating the Fire Service Agreement. *Id.* at 10. In response, NEA sued MSA Safety for alleged violations of the Maine Franchise Laws for Power Equipment, Machinery and Appliances, 10 M.R.S. §§ 1361–1370 (2025) (the "Franchise Laws"), and the Maine Unfair Trade Practices Act, 5 M.R.S. §§ 205-A to 214 (2025) ("MUTPA"). *See id.* at 15–17. NEA's pending Motion to Amend also seeks to add a claim under the Maine Farm Machinery, Forestry Equipment, Construction Equipment and Industrial Equipment Dealerships Act, 10 M.R.S. §§ 1285–1298 (the "Act"). ECF No. 18 at 4. Additionally, NEA requested a temporary restraining order and/or preliminary injunction ("First TRO Motion"), ECF No. 4, and MSA Safety sought to compel arbitration of the parties' dispute pursuant to the terms of the Agreement and the Federal Arbitration Act ("FAA"), ECF No. 9.

---

[3] "Any controversy, claim or dispute arising under this Agreement shall be finally settled by arbitration in accordance with the rules then in effect of the American Arbitration Association in Pittsburgh, Pennsylvania by three arbitrators appointed according to those rules. Any award of the arbitrators shall be final and conclusive on the parties to this Agreement, judgment upon such award may be entered in any court having jurisdiction thereof, and no appeal shall lie therefrom. Each party hereto hereby gives consent to the personal jurisdiction of any such court in reference to any matter arising out of the foregoing arbitration or the enforcement thereof." ECF No. 29-4 at 31.

[4] "This Agreement shall be deemed to be a contract made under the laws of the Commonwealth of Pennsylvania and shall for all purposes be construed and enforced in accordance with the laws of the said Commonwealth." ECF No. 29-4 at 32.

[5] "This Agreement shall be effective as of the day and year first above written and shall continue until terminated by either party hereto at any time upon at least 30 days' prior written notice to the other, except as otherwise provided in this Agreement. Termination of this Agreement shall not affect MSA [Safety]'s obligation to fill orders which are received while this Agreement is in effect, except that MSA [Safety] may, subject to its own discretion, require COD payment for goods shipped or impose such other special credit terms as it deems appropriate. Upon termination of this Agreement by MSA [Safety], MSA [Safety] will accept the return from Distributor, transportation charges prepaid, of all Products held in stock by Distributor pursuant to paragraph 2(c) hereof (except for obsolete or discontinued Products, regardless of their condition) and shall reimburse Distributor for all amounts paid by Distributor to MSA [Safety] therefore, provided such returned Products are undamaged and still in salable condition." ECF No. 29-4 at 29.

On December 4, 2025, I granted in part NEA's First TRO Motion,[6] *see* ECF Nos. 4, 36, which I later extended an additional fourteen days for good cause, *see* ECF No. 49. On December 15, 2025, I held a hearing to address the Motion to Amend and Arbitration Motion. ECF No. 54.

## II.    Amendment

### A. The Parties' Arguments

Turning first to NEA's request to amend its complaint for a second time.[7] While MSA Safety's Arbitration Motion was pending, NEA filed its Motion to Amend, requesting this Court's leave to add a claim under the Act. *See* ECF No. 18 at 3–4. In so doing, NEA seeks to include a pointed challenge to the Fire Service Agreement's arbitration clause, arguing the Act calls into question the clause's validity. *Id*. at 4; ECF No. 50 at 3 (basing its argument on section 1294(3) of the Act, which states arbitration "must be in the city or county in which the dealer maintains the dealer's principal place of business in the State"). NEA insists the Motion to Amend is timely and denies any bad faith on its part.[8]

MSA Safety contends the Court should defer ruling on the Motion to Amend until it decides the Arbitration Motion or save the amendment decision for the arbitrator. ECF No. 39 at 1. MSA Safety asserts the Act does not bar arbitration in this case in any event, and instead claims the Act, at most, addresses only the location of arbitration, which can be adjusted by the arbitrator.[9] *Id*. at 3. MSA Safety further objects to the amendment,

---

[6] In so doing, I also denied as moot NEA's second emergency motion for a temporary restraining order. *See* ECF No. 35.

[7] NEA's first amendment changed solely by way of adding MSA Safety as a Defendant. ECF No. 50 at 5 n.3.

[8] NEA filed the Motion to Amend before MSA Safety filed any responsive pleading; further, NEA submitted its Motion to Amend around one week after MSA Safety removed the case to federal court, *see* ECF No. 1, and just six days after MSA Safety filed it Arbitration Motion, *see* ECF No. 9.

[9] While the Agreement apparently requires three arbitrators, ECF No. 29-1 at 31, for the sake of simplicity, I will refer to "arbitrator" in the singular.

claiming NEA acted in a bad faith by filing the Motion to Amend in order to delay and undermine arbitration. *Id.* at 3–4.

## A.  Legal Standard and Discussion

District courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Rule 15(a)(2) "reflects a liberal amendment policy" and delegates significant discretion to the district court in ruling on leave to amend. *U.S. ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 48 (1st Cir. 2009). A court may grant leave to amend where the circumstances indicate no "undue delay, bad faith, futility, [or] the absence of due diligence on the movant's part." *Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir. 2006). Here, there is no showing of undue delay, bad faith, futility, or lack of diligence on the part of NEA. As such, I **GRANT** NEA's Motion to Amend and treat the Second Amended Verified Complaint, ECF No. 18-1, as the operative complaint for the purposes of the Arbitration Motion.[10]

## III.    Arbitration

### A.  Legal Standard

The FAA embodies the "fundamental principle that arbitration is a matter of contract." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). In enacting the FAA, Congress aimed to "guarantee the enforcement of private contracts by which parties agree to arbitrate disputes rather than litigate them." *Baychar, Inc. v. Frisby Techs.*, No. 01-CV-28, 2001 WL 856626, at *5 (D. Me. July 26, 2001). "As a result, arbitration agreements are 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Coinbase, Inc. v. Suski*, 602 U.S. 143,

---

[10] As discussed below, the outcome of the Arbitration Motion remains the same.

147–48 (2024) (quoting 9 U.S.C. § 2). Accordingly, before a court can compel arbitration, the moving party must show: (1) "a valid agreement to arbitrate exists"; (2) they are "entitled to invoke the arbitration clause"; (3) "the other party is bound by that clause"; and (4) "the claim asserted comes within the clause's scope." *Air-Con, Inc.*, 21 F.4th at 174 (quotation modified).

## B. Discussion

This case falls within a familiar framework because, "[a]s always in arbitrability cases, there are disputes upon disputes, questions embedded within questions, and disputes about who should be answering those questions." *McKenzie v. Brannan*, 19 F.4th 8, 16 (1st Cir. 2021). Here, NEA disputes the validity of the Fire Safety Agreement in its entirety, as well as the arbitration clause specifically. MSA Safety, on the other hand, maintains the Agreement, including its arbitration and delegation provisions, is valid and binding on the parties. As such, MSA Safety argues the Court cannot evaluate the validity of the Agreement because that is a threshold consideration the Agreement delegates to the arbitrator. NEA claims the gateway issue of arbitrability is within the Court's purview. MSA Safety further contends even if the Court considers the question of arbitrability, the underlying dispute falls within the scope of the Agreement's broad and binding arbitration provision. For the reasons discussed herein, I conclude the Court should address the question of arbitrability and, in so doing, I find there exists a valid agreement to arbitrate. I further conclude all of NEA's claims fit within the scope of the Agreement's arbitration provision and, as such, are questions for the arbitrator.

1. *Whether a Valid Agreement to Arbitrate Exists*

a. Choice of Law

I begin by discussing the law that governs my analysis of the Fire Service Agreement. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *InterGen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003) (quotation modified). In determining whether parties agreed to arbitrate, courts apply "ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Therefore, I look to state contract law to determine the validity of the Agreement. In this case, the parties' Agreement contains a choice-of-law provision under which Pennsylvania law governs the contract's construction and enforcement. *See* ECF No. 29-4 at 32 ("This Agreement shall be deemed to be a contract made under the laws of the Commonwealth of Pennsylvania and shall for all purposes be construed and enforced in accordance with the laws of the said Commonwealth.").

Even with a choice-of-law provision, a federal court sitting in diversity looks to the forum state's conflict of law rules to determine which state's substantive law applies to contract interpretation. *See Priv. Cap. Fund LLC v. Begg*, No. 2:21-CV-00090, 2021 WL 3422371, at *3 (D. Me. Aug. 5, 2021); *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir. 1991). Because MSA Safety removed this case under diversity jurisdiction, I apply Maine law. Under Maine law, a court must enforce a choice-of-law provision, except where the chosen state lacks a substantial relationship to the parties or applying its law would violate a fundamental public policy of Maine. *XL Sports World, LLC v. Dynamic Sports Constr., Inc.*, 784 F. Supp. 3d 289, 298 (D. Me. 2025).

Here, Maine law recognizes a substantial relationship between the parties and Pennsylvania because MSA Safety is incorporated and headquartered in the Commonwealth. *See* ECF No. 29-4 at 2; *see, e.g.*, *Johnson v. Polaris Sales, Inc.*, 257 F. Supp. 2d 300, 305 n.4 (D. Me. 2003) (noting "a substantial relationship exists between Minnesota and the parties because both [d]efendants are incorporated in Minnesota"); *XL Sports World*, 784 F. Supp. 3d at 298 (finding a substantial relationship to Texas because the defendant "is a Texas corporation with its principal place of business in Texas"). Furthermore, while NEA contends certain clauses contained within the Fire Service Agreement are contrary to Maine policy, "[n]either party has claimed applying [Pennsylvania] law would be contrary to [Maine's fundamental public] policy" nor disputes the applicability of Pennsylvania law. *Id.*; *see also Borden*, 935 F.2d at 375 ("Where, however, the parties have agreed about what law governs, a federal court sitting in diversity is free, if it chooses, to forgo independent analysis and accept the parties' agreement.").

Accordingly, I must rely on Pennsylvania substantive law in determining whether a valid agreement to arbitrate exists and binds the parties. *See, e.g.*, *Alonso v. Am. Express Co.*, 651 F. Supp. 3d 272, 281 (D. Me. 2023).

## b. Delegation

I next address the question of whether this Court or an arbitrator should determine the threshold issue of arbitrability. As is true of the Fire Service Agreement here, arbitration provisions are regularly embedded within a larger contract. Sometimes nestled within the arbitration provision, there can be a delegation clause, whereby the parties agree to delegate issues of arbitrability to the arbitrator. *Rent-A-Ctr.*, 561 U.S. at 68. A delegation clause "'is simply an additional, antecedent agreement the party seeking

arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other.'" *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019) (quoting *Rent-A-Ctr.*, 561 U.S. at 70). The issue here is whether a valid delegation clause exists. MSA Safety contends the Agreement's arbitration provision incorporates the American Arbitration Association ("AAA") rules,[11] thereby delegating through reference the question of arbitrability to the arbitrators. ECF No. 51 at 2. NEA disagrees and claims this Court should decide arbitrability; and while it frames its arguments as, in part, being directed towards the arbitration provisions in particular, NEA's largely levies its allegations against the validity of the Agreement as a whole. ECF Nos. 34 at 4–8, 53 at 6 n.5.

There is a presumption that courts will decide threshold questions of arbitrability, such as "whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 186 (2019) (quoting *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003)). Even so, "parties are free to authorize arbitrators to resolve such questions, [but courts] will not conclude that they have done so based on 'silence or ambiguity' in their agreement, because 'doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.'" *Id.* (quoting *Kaplan*, 514 U.S. at 945) (quotation modified). Therefore, an agreement to arbitrate arbitrability requires "clear and unmistakable evidence" of an intent to do so. *Kaplan*, 514 U.S. at 944 (quotation modified). If such clear and

---

[11] The Fire Service Agreement does not identify which AAA rule applies, but Rule 7(a) of the AAA's Commercial Arbitration Rules and Mediation Procedures states: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement." Other categories of AAA rules have similar jurisdictional provisions.

unmistakable evidence exists, the issue of arbitrability is effectively delegated to the arbitrator with the court limited to deciding "whether a valid arbitration agreement exists." *Henry Schein*, 586 U.S. at 69. If the agreement does not contain clear and unmistakable evidence of delegation, the question of arbitrability is for the court to decide. *AT & T Techs, Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."). Here, there is no express language delegating the question of arbitrability. Therefore, the propriety of sending the arbitrability question to the arbitrator hinges on whether the Fire Safety Agreement's inclusion of the language "in accordance with the rules then in effect of the American Arbitration Association," ECF No. 29-4 at 31, provides clear and unmistakable evidence of delegation.

MSA Safety is correct that incorporation of AAA rules can evidence the parties' clear and unmistakable intent to arbitrate arbitrability. *See, e.g.*, *Deardorff v. Cellular Sales of Knoxville, Inc.*, CV. No. 19-2642, 2022 WL 407396, at *8–10 (E.D. Pa. Feb. 9, 2022) (collecting cases supporting the contention "parties may 'clearly and unmistakably' delegate arbitrability issues to an arbitrator by incorporating by reference the [AAA] . . . rules"). However, these decisions do not support drawing a per se conclusion that referencing the AAA rules, without more, constitutes clear and unmistakable evidence. For example, in *Deardorff*, the agreements at issue contained a clause specifically stating arbitration covered questions related to "interpretation, validity or enforcement," as well as specifically referenced a particular set of arbitration rules and procedures. *See id.* at *2. Similarly, the cases cited by the *Deardorff* Court all contain similar provisions explicitly assigning the gateway issue of arbitrability to the arbitrator. *See id.* at *9 (collecting cases

finding clear and unmistakable evidence of delegation in agreements that contained language such as "the arbitrator shall have exclusive authority relating to the scope and enforceability of this arbitration provision or any other term of this [a]greement" and "[t]he [a]rbitrator . . . shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this [a]greement" (internal quotations omitted)). No such language exists in the Agreement at issue here. *See* ECF No. 29-1 at 31.

Additionally, in *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746 (3d Cir. 2016), the Third Circuit addressed the question of delegation in the context of a class wide arbitration. *Id.* at 760–61. While its discussion of class wide arbitration and multiple contracts is not fully applicable to this case, the *Chesapeake* Court provides a useful overview of bilateral arbitration cases that "have considered the issue" and "determined that incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Id.* at 763, 764–65 (collecting cases). However, the contracts at issue in these cited cases, with one exception, all specifically referenced a particular set of AAA rules, such as the "Commercial Arbitration Rules," *see, Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005), or the "Construction Industry Arbitration Rules," *see Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 674 (5th Cir. 2012). Unlike the contracts in those cases, the Agreement at issue here is silent as to which set of AAA rules should apply. *See* ECF No. 29-1 at 31.

Furthermore, with respect to "ordinary state law principles governing contract formation," *Chesapeake* provides the following guidance under Pennsylvania law: "Incorporation by reference is proper where the underlying contract makes clear

reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship." *Chesapeake*, 809 F.3d at 761–62 (internal quotations omitted). Here, in light of the sheer number of AAA rule sets that could be referenced, the agreement contains no "clear reference to a separate document." *See Std. Bent Glass*, 333 F.3d at 447; *see Rules, Forms, and Fees*, American Arbitration Association, https://www.adr.org/rules-forms-and-fees/ (last visited December 23, 2025). Accordingly, the Agreement is, at best, silent as to which set of AAA rules it seeks to incorporate by reference.

Furthermore, the Agreement's arbitration provision states: "Each party hereto hereby gives consent to the personal jurisdiction of any such court in reference to any matter arising out of the foregoing arbitration or the enforcement thereof." ECF No. 29-4 at 31. This language creates additional ambiguity as to the role of the arbitrator because it indicates some place for the Court in arbitrating the Agreement. Because the Agreement at issue here does not include an explicit provision either reserving arbitrability for the courts or assigning it to the arbitrator, the Agreement is ambiguous as to who decides arbitrability.

Accordingly, I do not find the Agreement's reference to the AAA in its arbitration provision constitutes a clear and unmistakable delegation of arbitrability to the arbitrator. As such, the question of whether the dispute is arbitrable is for this Court to decide.

c. Arbitrability

Having determined the Court decides the question of arbitrability, I next analyze "whether [the parties] agreed to arbitrate the merits" of the dispute. *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024). NEA argues its claims under the Franchise Law and Act

are not subject to arbitration. ECF No. 34 at 4–7. MSA Safety disputes this contention. ECF No. 51 at 2–5. MSA Safety has the more availing argument.

Starting with NEA's arguments under the Franchise Laws, NEA maintains the entire Agreement is void on public policy grounds. NEA asserts because the Agreement violates the Franchise Laws by way of its termination and damages clauses, it is contrary to the Franchise Laws' "public policy" section, which reads: "A contract or part of a contract or activity undertaken pursuant to a contract in violation of this chapter is deemed against public policy and is void and unenforceable." 10 M.R.S. § 1368; *see* ECF No. 34 at 5–6. NEA makes a similar argument regarding the Act, arguing the Act's section requiring "the place of any arbitration must be in the city or county in which the dealer maintains the dealer's principal place of business in the State [of Maine]" voids the Agreement because it mandates Pittsburgh, Pennsylvania, as the venue for arbitration. 10 M.R.S. § 1294(3); ECF No. 34 at 5–6, 7. NEA argues by violating these statutory provisions, the entire Agreement is void and unenforceable. *Id*. at 5. NEA's sole argument against the validity of the arbitration provision itself relates to its claim under the Act, as NEA contends the arbitration provision contravenes Maine law by mandating arbitration in Pittsburgh, Pennsylvania, when the Act specifically provides for arbitration near the "dealer's principal place of business." ECF No. 34 at 7.

In response, MSA Safety argues even if the Agreement is void for public policy reasons, the arbitration clause is severable from the remainder of the contract, leaving the question of voidness for the arbitrator. ECF No. 51 at 2. MSA Safety further argues NEA's only argument directed specifically towards the arbitration clause involves section 1293(3) of the Act, which is preempted by the FAA and, in any event, concerns venue, which can be addressed by the arbitrator. *Id*. at 4. During the hearing, MSA Safety further

argued even if the arbitration provision runs afoul of the Act, it does not void the entire Agreement—only the offending sections—which would thereby leave the contract intact and send the dispute to the arbitrator. ECF No. 54.

I first address NEA's argument under the Franchise Laws, which does not apply "equally to the whole contract" such that this "[C]ourt must address that challenge." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024) (quotation modified). Rather, NEA claims that because the Agreement allegedly violates Maine public policy, it is void in its entirety, including the arbitration provision. Because this is a challenge to the validity of the contract in its entirety, not a discrete attack against the arbitration provision itself, the challenge falls within the arbitrator's purview and not the Court's. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967) (noting a party cannot avoid arbitration by attacking the contract in its entirety, rather it must direct a challenge to the arbitration clause itself).

NEA's arguments under the Act, through which NEA directs a challenge to the arbitration clause itself, fare no better. Under Pennsylvania law, "when a contract's term violates a provision of a statute or the contract cannot be performed without violation of such statute, the *contract's term* is void for public policy reasons." *NEXUS 1, LLC v. Sidwell*, No. CV 23-0216, 2025 WL 2375219, at *10 (E.D. Pa. Aug. 14, 2025) (emphasis added). Therefore, even if the Act prohibits the Agreement from providing for an arbitration venue outside of the city where NEA has a principal place of business, it does not necessarily void the entire Agreement, nor the entire arbitration provision. Instead, under Pennsylvania law, only the provision mandating the location of arbitration will be stricken if the Act was to apply. Nonetheless, this is a determination best left to the arbitrator, who has the power to determine proper venue.

Furthermore, even if the Agreement is void for public policy reasons, under the FAA, "an arbitration provision is severable from the remainder of the contract." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006); *see Prima Paint*, 388 U.S. 395 (1967). NEA maintains the FAA is not applicable to this dispute because the Agreement's terms only provide for interpretation under Pennsylvania law, *see* ECF No. 53 at 2–3. This contention is incorrect, however, because the Agreement concerns "commerce among the several states." 9 U.S.C. §§ 1, 2; *see Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 268 (1995). Accordingly, under the severability principle, the arbitration provision remains valid and binding on the parties even if the Agreement is void for public policy reasons.

   2. *Whether NEA's Claims Fall Within the Scope of the Arbitration Provision*

### a. Intent

Turning to scope, unless an arbitration agreement expressly provides otherwise, a court (not the arbitrator) must decide the arbitration clause's scope. *Sleeper Farms v. Agway, Inc.*, 506 F.3d 98, 102 (1st Cir. 2007). In doing so, the Court "rigorously enforce[s]" the terms of the agreement. *Bossé*, 992 F.3d at 27 (quoting *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013)). At the same time, courts presume "the parties likely gave at least some thought to the scope of arbitration*," Kaplan*, 514 U.S. at 945, against the backdrop of the FAA's "liberal federal policy favoring arbitration," *Bossé*, 992 F.3d at 31 (quoting *Oliveira v. New Prime, Inc.*, 857 F.3d 7, 12 (1st Cir. 2017)). This policy requires "ambiguities as to the scope of the arbitration clause itself [be] resolved in favor of arbitration." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989). Therefore, if the agreement to arbitrate covers at least "some

issues," other matters are "presumed to be arbitrable 'unless it is clear that the arbitration clause has not included them.'" *Bossé*, 992 F.3d at 31 (quoting *Kaplan*, 514 U.S. at 945).

As with federal law, Pennsylvania law favors arbitration. *Kaneff v. Del. Title Loans, Inc.*, 587 F.3d 616, 624 (3d Cir. 2009); *see Sorathia v. Fidato Partners, LLC*, 483 F. Supp. 3d 266, 273–74 (E.D. Pa. 2020) ("When, however, the parties agree to arbitration in a clear and unmistakable manner, then every reasonable effort will be made to favor such agreements."). Here, the arbitration clause contains no ambiguities or limiting language, stating "[a]ny controversy, claim or dispute arising under this Agreement shall be finally settled by arbitration." ECF No. 29-4 at 31. Even if this language is slightly less expansive than the archetypal "broad" arbitration clause because it does not explicitly cover disputes "related to" the Agreement, only those "arising under" it, Pennsylvania courts nevertheless have found similar language sufficiently broad as to require arbitration. *Miron v. BDO Seidman, LLP*, 342 F. Supp. 2d 324, 330 (E.D. Pa. 2004) ("When an arbitration clause provides for arbitration of all matters 'arising under' or 'arising out of' a particular agreement, the clause is typically construed broadly to suggest that a given dispute is arbitrable."); *see Battaglia v. McKendry*, 233 F.3d 720, 727 (3d Cir. 2000) ("[W]hen phrases such as 'arising under' and 'arising out of' appear in arbitration provisions, they are normally given broad construction . . . ."). Furthermore, "[w]hen parties create a contractual relationship which includes a broad arbitration agreement, they intend to include within the scope of arbitration any dispute arising from the termination of that contractual relationship unless they clearly evidence a purpose to exclude such disputes." *Goodwin v. Elkins & Co.*, 730 F.2d 99, 110 (3d Cir. 1984) (quotation modified). Accordingly, under Pennsylvania law, the Agreement's broad

arbitration clause creates a strong presumption in favor of arbitrating all disputes in the instant case.

b. Termination

NEA also argues that because the Fire Safety Agreement's arbitration provision contained no explicit survival clause, any obligation to arbitrate expired when MSA Safety purportedly terminated the Agreement and effectively ended the parties' contractual relationship in full. ECF No. 53 at 3–4. But this argument seemingly disregards the earlier discussed case law holding an arbitration provision is severable from the contract in which it is housed and independently enforceable. *See, e.g.*, *Prima Paint*, 388 U.S. at 402 (stating "arbitration clauses as a matter of federal law are 'separable' from the contracts in which they are embedded"); *Buckeye*, 546 U.S. at 445 ("[A]n arbitration provision is severable from the remainder of the contract."); *Emcasco Ins. Co. v. Nasuti*, Civ. No. 90–3424, 1992 WL 19858, at *3 (E.D. Pa. Jan. 30, 1992), *aff'd*, 975 F.2d 1549 (3d Cir. 1992) (sitting in diversity applying Pennsylvania substantive law and noting "arbitration clauses are generally treated as separable and are not rescinded by attempted rescission of the entire contract"). Here, because there is no evidence the arbitration clause was itself specifically rescinded, I find the arbitration provision survives the Agreement's purported termination.

*3. Whether This Court Has Authority to Compel Arbitration in Another Jurisdiction*[12]

While the Agreement's arbitration clause is broad in scope, it is quite specific as to the location of arbitration, identifying Pittsburgh, Pennsylvania, as the venue for

---

[12] While I requested supplemental briefing on this Court's jurisdictional authority to compel arbitration, ECF No. 49, neither party submitted briefing addressing my power to compel arbitration outside of Maine, and neither party provided a substantive analysis of the issue during the hearing.

arbitration. ECF No. 29-4 at 31. This presents a wrinkle in the Court's authority to compel arbitration, as the FAA directs courts to enforce arbitration agreements within the judicial district in which they sit. 9 U.S.C. § 4 ("[T]he court *shall* make an order directing the parties to proceed to arbitration . . . . The hearing and proceedings . . . *shall* be within the district in which the petition [was filed]." (emphasis added)). Courts have declined to order arbitration when an arbitration agreement expressly provides for a venue outside the hearing court's judicial district. *Booth v. Citizens Bank, N.A.*, 691 F. Supp. 3d 443, 450–51 (D.R.I. 2023) (declining to order arbitration despite finding dispute was arbitrable because agreement mandated forum outside judicial district); *Port Erie Plastics, Inc. v. Uptown Nails, LLC*, 173 F. App'x 123, 128 (3d Cir. 2006) (collecting cases holding the same); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 328 (7th Cir. 1995) ("[A] district court lacks the authority to compel arbitration in other districts, or in its own district, if another [judicial district] has been specified for arbitration.").

Here, this Court cannot compel arbitration given the Agreement specifies Pittsburgh, Pennsylvania, as the requisite location for arbitration. Accordingly, because I lack authority to compel arbitration outside of Maine, I must transfer the case to the United States District Court for the Western District of Pennsylvania to effectuate the arbitration agreement. *See* 28 U.S.C. § 1404(a);[13] *McCabe v. Ford Motor Co.*, 774 F. Supp. 3d 332, 348 (D. Mass. 2025) (transferring a case pursuant to 28 U.S.C. § 1404(a) and reasoning "a Court may transfer a case to cure improper venue sua sponte" in the context of a motion to compel arbitration where, as here, the "defendant did not request

---

[13] "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." 28 U.S.C. § 1404(a).

a transfer of venue . . . and neither party raised the issue in its briefing" (quotation modified)); *Desmond v. Nynex Corp.*, No. 94-1230, 1994 WL 577479, at *3 (1st Cir. Oct. 20, 1994) ("It is well settled that a court may transfer a case sua sponte pursuant to 28 U.S.C. §§ 1404(a) and 1406(a).").

## IV.    Conclusion

For the reasons stated above, NEA's Motion for Leave to File a Second Amended Verified Complaint, ECF No. 18, is **GRANTED**, and the operative complaint is ECF No. 18-1. Given that arbitration is required and must take place in Pittsburgh, Pennsylvania, I **TRANSFER** this case to the United States District Court for the Western District of Pennsylvania to enforce the arbitration agreement. ECF No. 9.

**SO ORDERED.**

Dated this 23rd day of December, 2025.

/s/ Stacey D. Neumann
**UNITED STATES DISTRICT JUDGE**